2026 IL App (1st) 232442-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
July 27, 2026

No. 1-23-2442

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 21 CR 12635 |
| | ) | |
| DENNIS GREEN, | ) | The Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* The evidence was sufficient to disprove defendant's self-defense claim beyond a reasonable doubt. Victim's employer's internal policy on not arguing with or threatening criminal offender was irrelevant to whether defendant or victim was aggressor. Trial court did not ignore mitigating evidence of self-defense or consider improper factors in sentencing defendant.

¶ 2    Defendant Dennis Green was convicted by a jury of aggravated battery with a firearm for the shooting of Alonzo Johnson (720 ILCS 5/12-3.05(e)(1) (West 2020)) and of aggravated battery to a transit employee for the act of spitting on Johnson while he was performing his duties of operating a bus for the Chicago Transit Authority (CTA) (*id.* § 12-3.05(d)(7)). Defendant was

found not guilty of attempt first degree murder. He was sentenced to 27 years on the conviction for aggravated battery with a firearm and 3 years on the conviction for aggravated battery to a transit employee, to run consecutively. On appeal, defendant challenges his conviction for aggravated battery with a firearm as well as his sentences on both convictions. We affirm defendant's conviction and sentence.

¶ 3                                    I. BACKGROUND

¶ 4                                        A. Trial

¶ 5        At trial, Johnson testified that on September 4, 2021, he was working as a bus operator for the CTA, driving the #20 Madison route. At 8:50 p.m., he reached the end of his route at East Washington Street near Michigan Avenue. Defendant was a passenger in the rear seat of the bus. Johnson shouted to him that it was the end of the line and that he needed to exit. Initially, defendant was uncooperative and remained in his seat, but he then got up and walked toward Johnson, who was in the driver's seat. As defendant did so, he stated, "[Y]ou bus drivers need to watch how you talk to people. What would you do if I spit in your face?" Defendant then spit into Johnson's face, which Johnson testified hit him between his nose and eyes. Defendant then exited the bus. Johnson activated his silent alarm and, noticing a police cruiser about 20 feet away, also exited the bus. Johnson yelled in an attempt to attract the attention of the police and also attempted to apprehend defendant, who walked in the opposite direction of the police cruiser.

¶ 6        Johnson testified that upon reaching defendant, "I went to grab him. I swung at him first, and I went to grab him and hold him trying to pull him toward the police car while yelling for the police." Johnson testified that he and defendant "tussled," meaning Johnson had him in a headlock trying to pull him, but defendant got out of the headlock. Then defendant, while facing Johnson, pulled out a gun and shot him in his left jaw. Upon being shot, Johnson stumbled toward the police

car, which was unoccupied. He lay down on the sidewalk and was attended by several people nearby. Police and ambulance arrived. Johnson was taken to a hospital where he underwent emergency surgery. He thereafter underwent four additional surgeries to remove the bullet and reconstruct his jaw, and his mouth was wired shut for five to six months. Johnson testified that he only has 80 percent jaw function, which his doctors have told him is the most he will recover.

¶ 7    Two videos were admitted into evidence and published to the jury during Johnson's testimony showing the events at the time in question. One video showed the events that occurred within the interior of the bus, and the second video showed the events that occurred on the street outside of the bus.

¶ 8    On cross-examination Johnson testified that his first action after getting off the bus was to punch defendant in the back of the head with his fist. Defendant was not facing him at that time. Johnson then wrapped his right arm around defendant's neck, placing defendant in a chokehold and squeezing his neck while attempting to pull him toward the police car. He pulled defendant into the middle of the street, where cars were passing by. He acknowledged that he was angry that defendant had spit in his face.

¶ 9    Jonathan Maldonado testified that he was walking to meet his girlfriend when he heard a gunshot. He looked to his left and saw a uniformed bus driver "in a clinch" with an individual in a dark jacket or hoodie, jeans, and red shoes. Maldonado first went up to the bus driver and saw that he had a hole in his face and was bleeding from the jaw. Maldonado testified that he decided to pursue the defendant, who was running south on North Garland Court about 30 feet ahead. He observed defendant take off his jacket, at which point he was wearing a white t-shirt and a backpack. Maldonado testified that he kept pace with defendant, who had stopped running and was "zigzagging through downtown" until eventually returning to Michigan Avenue. Maldonado

called 911 and gave a description of defendant. Two police officers on bicycles eventually approached defendant from behind, and Maldonado reconfirmed his description to the dispatcher. He then observed the officers detain defendant. Maldonado's call to 911 was published to the jury during his testimony.

¶ 10    Doneisha McGee testified that she was near North Garland Court walking to Millenium Park when she saw "tussling" and heard a gunshot. This occurred next to a bus and involved a bus driver in a CTA uniform struggling with a man wearing black. The men's arms were on one another's shoulders, and they were pushing each other in a circular motion. She heard a noise, which she first thought was a firecracker, and then saw blood trickling from the bus driver's head. The man who was wearing black ran between McGee and her sister headed in the opposite direction of the bus. She testified that the man smiled at them as he passed, and then he went into the alley. McGee went to the bus driver and waited with him until the police and paramedics arrived. On cross-examination, McGee denied stating to police officers that she was able to see only the legs and part of the chests of the men struggling due to something obstructing her view.

¶ 11    Officer Jeffrey Bybee of the Chicago Police Department testified that he and a partner were on bicycle patrol that evening and were involved in attempting to locate a person matching the description of the shooter. The two of them, along with another police vehicle, converged on defendant near Wabash and Jackson. Defendant appeared to be starting to run away but fell. He was taken into custody. Officer Bybee's body worn camera footage of the encounter was admitted into evidence and published to the jury during his testimony.

¶ 12    Officer Gregory Doherty, then of the Chicago Police Department, testified that he was working as a patrol officer. He responded to a call at 54 East Jackson Boulevard, at which point he observed defendant being detained by other officers. He observed a firearm falling from

defendant's person onto the ground, where Officer Doherty recovered it. He cleared the gun, which was loaded with a live .9 millimeter cartridge in the chamber.

¶ 13      Detective Jessica Highland of the Chicago Police Department was assigned to investigate the case. She called an evidence technician concerning a shell casing, blood, and numerous pieces of teeth located at the scene and a hooded sweatshirt that was found dumped one to two blocks away.

¶ 14      Dr. Demetrious Kyriacou, an emergency medicine physician at Northwestern Memorial Hospital, testified to his treatment of Johnson on the night at issue. He explained that Johnson had a gunshot wound to his left jaw, which shattered the jaw along with numerous teeth and caused multiple lacerations within his mouth. He was sent to the operating room for intubation, stabilized in the surgical intensive care unit, and underwent jaw repair surgery by the plastic surgery team.

¶ 15      Officer Nick Beckman of the forensics division of the Chicago Police Department testified to his work processing the scene in this case. This included marking and photographing a fired cartridge case, teeth, and a blood stain; taking blood samples from the sidewalk; and collecting a fired cartridge case. He also photographed and recovered a dark hooded jacket that was located on a sidewalk in front of 98 East Madison Street.

¶ 16      Aimee Stevens, a specialist in firearms identification for the Illinois State Police division of forensic services, testified to her analysis of the firearm, unfired cartridges, magazine, and fired cartridge case that were recovered. Based on her examination of the fired cartridge case and comparison of it to the gun, Stevens concluded that the case was fired from the gun.

¶ 17      The parties stipulated that if called to testify, forensic scientist Kevin Gillespie of the Illinois State Police would testify that trace chemistry analysis he performed in this case showed that defendant discharged a firearm, contacted a gunshot residue-related item, or had his left hand in the environment of a discharged firearm.

¶ 18    The State rested. Defendant made a motion for directed verdict, which the trial court denied.

¶ 19    The defense called Detective Robert Curran of the Chicago Police Department to testify about a telephone conversation that he had with McGee on the day following this incident. He testified that during that conversation, McGee related that she was with her sister during the incident and that she saw a tussle. She related "that she saw parts of legs and chest but that there was something obstructing her view."

¶ 20    Defendant then testified on his own behalf. He testified that he boarded the bus at Madison and Kilpatrick to go to his home on the south side of Chicago. After boarding the bus, he put in his ear buds and fell asleep. He was awakened when the bus driver started banging and yelling, using profane language in telling him to get off the bus. Defendant asked the driver to open the rear doors of the bus, but he denied it. Defendant then went to the front of the bus, where he and the driver continued to exchange words. He testified, "We were arguing like spit flying from him. And I took it as he was spitting at me, and I spit back." He then exited the bus and began to walk down the sidewalk.

¶ 21    Defendant explained that as he was walking down the sidewalk, he was punched in the back of the head a couple of times. He did not know who was punching him. He then felt an arm being placed around his neck so as to start choking him. He then felt himself being dragged into the street. There were cars in the street, and defendant was thinking he was going to die. He was afraid and could not breathe. In an attempt to be released, he reached for the gun he was carrying and tried hitting the person in the head with it. He testified, "I was losing my breath. It was getting dark, so I felt myself getting weak. And I heard a shot." He testified that he did not pull the trigger or intend the gun to go off. After the gun was fired, he ran down the street. The reason he ran was because he was afraid and did not know what was going on. He testified that he did not know at

that time that the person who had punched him and put him in the chokehold was the bus driver. He never saw the face of the person who was behind him. He does not believe he was ever face-to-face with that person.

¶ 22    On cross-examination, defendant acknowledged he was able to watch the bus surveillance video exhibits published during trial. He agreed that it showed that there was a plexiglass partition between the seated bus driver and him, which he had to lean around to spit into the driver's face. He also agreed that it showed the bus driver was wearing a mask for most of that time. Defendant denied that he was ever facing the bus driver or pushing him at any point during the tussle. Defendant also denied hearing him calling for the police. He denied that he had "zigzagged" through various downtown streets after the incident and stated that he walked primarily on one street until he was arrested. He acknowledged taking off his sweatshirt, but he stated that he tucked it into the strap of his bookbag and did not leave it on the sidewalk. He testified that when he saw the police approach, he ran toward them, not away from them. He acknowledged that at the time he was arrested, he was on the phone with someone "getting legal advice."

¶ 23    The defense then rested. In rebuttal, the State published the body worn camera video of the police encounter with McGee that occurred at the scene on the day of the incident.

¶ 24    Following closing argument and the giving of jury instructions, the jury found defendant guilty on charges of aggravated battery with a firearm and aggravated battery to a transit employee. It found him not guilty on the charge of attempt first degree murder.

¶ 25                              B. Posttrial Motions

¶ 26    Following trial, defendant filed a *pro se* motion for a new trial. In that motion, he raised a claim pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), that his trial counsel had provided ineffective assistance in various particulars. One of these was that counsel "failed to give rules and

regulations" for CTA bus drivers explaining "the protocols for them if they take the law into their own hands." A counseled posttrial motion for new trial was also filed, which raised the argument that the court had erred in denying evidence of a CTA standard operating procedure document titled "Communications During and Following a Criminal Incident." During hearing on the *Krankel* motion, defendant asserted that discussion as to the admissibility of the CTA procedures had occurred in chambers outside of his presence. The trial court denied defendant's ineffective assistance claim and proceeded to argument on the motion for a new trial.

¶ 27    In denying the motion for a new trial, the court stated that it "recall[ed] specifically discussing this issue regarding CTA procedures and how the defense wished to bring in the fact that [Johnson] apparently didn't comply in that he got off the bus when he should not have gotten off the bus after he had been spit on." The trial court stated that it took responsibility for the fact that this argument had not been preserved in the record. That trial court explained that its ruling had been and continued to be that this evidence was not relevant to a claim of self-defense.

¶ 28                                C. Sentencing

¶ 29    The matter proceeded to sentencing. A presentence investigative report (PSI) was prepared, which indicated that defendant had juvenile adjudications for aggravated battery in 1997, aggravated battery and aggravated assault in 1998, and possession of a stolen automobile in 1998. The PSI also indicated that defendant had prior adult felony convictions for possession of a controlled substance in 1999, aggravated robbery in 2001, attempt burglary in 2005, and unlawful possession or use of a firearm by a felon in 2009. Notably, defendant's version of events as set forth in the PSI indicates defendant reported that "he felt he was only defending himself" when this accidental shooting occurred, about which he felt significant remorse.

¶ 30    The State indicated that it intended to *nolle pros* several charges involving the possession of

weapons that stemmed from this same incident but that had been severed prior to trial. These charges were for armed habitual criminal, unlawful use of a weapon by a felon, aggravated unlawful use of a weapon, and defacing the identification marks of a firearm. However, the State asked the trial court to consider these charges in aggravation.

¶ 31    The State proceeded to argue in aggravation that defendant's conduct caused serious harm to Johnson when he was shot in the face at close range; it also threatened serious harm to others, as the shooting occurred in one of the busiest areas of the city. It cited defendant's criminal history and argued that a significant sentence was necessary to deter others from committing the same crime. The State argued that it was "preposterous" in light of the video evidence for defendant to argue that he was attacked or beaten in the street during this incident. It pointed out that the video showed defendant continuing to look back at Johnson for about three seconds after he exited the bus. It argued that defendant's behavior in evading the police after this incident was not consistent with that of a person who had just used a firearm only out of fear for his life.

¶ 32    In mitigation, defense counsel argued that defendant had taken responsibility for many of his actions and deeply regretted what had occurred. Defense counsel also emphasized that defendant was reacting to being grabbed from behind and choked and that his claim of self-defense was legitimate. Counsel highlighted that defendant was 40 years old. He had three children and one grandchild. He had been working full time for four years as a truck driver, and he also worked part time as a driver for Divvy Bikes. He also cut hair to make extra money. Counsel also pointed out that defendant had sought the help of a mental health professional following the death of his mother, which showed that he was trying to better himself and be a productive member of society.

¶ 33    Defense counsel also pointed out that several of defendant's family members were present and that four letters had been submitted to the court on his behalf. One was from Doreen Dabor,

who founded a street ministry that serves homeless individuals and families in need. She explained that for the past 13 years, defendant had been volunteering by providing free haircuts to the people her ministry served. She explained how defendant's work had changed the lives of many people. Defense counsel urged the court to impose the minimum sentence.

¶ 34　　In allocution, defendant emphasized that he was deeply regretful and apologetic for what happened to Johnson. He stated that it was not intentional but that he still maintained that he was defending himself. He discussed how he had always tried to be a role model and mentor to his children and others in the community. He asked the trial court for some leniency in sentencing to allow him to return as a productive member of society.

¶ 35　　The trial court began its ruling by stating that it had considered the facts adduced at trial, the factors and arguments in aggravation and mitigation, defendant's allocution, and the PSI. The court then made certain comments that touched upon Johnson's job as a CTA bus driver and transit system employees generally:

> "This is frankly an abominable circumstance. This is a gentleman who is a long-time CTA employee, one of those unsung jobs that never gets mentioned but is critical to the fabric *** of this large municipal area.
>
> *** Not everybody is affluent enough to have a car. We require this large infrastructure, I guess is the word, financed by our state, federal, local government that operates in [an] extraordinarily commendable fashion in getting people *** all across this city ***.
>
> From one side to the other. From 127th to Western, to Ridge and Howard, from the lakefront to Harlem Avenue. And it happens every day like magic, whether it is 5:00 PM or 5:00 AM. And the people who do that are deserving of acknowledgment of their importance to our community.

Mr. Johnson went to work on the date in question, September 4, 2021, a presumably seasonable late summer evening, was doing his job, driving people back and forth, and in this instance to downtown Chicago, what we hope ought to be a vibrant part of what ought to be a vibrant community, but because of the selfish manner in which some people wish to express themselves with firearms is sometimes less so than it so often is and has been in past years, people who think they can import themselves with impunity with their guns of the hand, as it were, and can use those guns to exact their measure of justice when they feel themselves slighted. And we shrug our shoulders and wring our hands and say, oh, it's so horrible, what can we do? Sometimes not so much. Sometimes a little bit, and we will today."

¶ 36     The court stated that it was taking into account defendant's juvenile adjudications for aggravated battery because these were indicative of violence against other persons. The court also recited defendant's felony convictions. It then went on to state:

"[Defendant] certainly didn't [comport himself with the law] on the evening of September 4th, 2021, when, as is clear from the video and the testimony in the case, he spit in the face of Mr. Johnson.

I would imagine that that was always a horrid thing to sustain going back throughout history, but, frankly, much more so in this day and age when there are so many more diseases that can afflict us, things like AIDS, things like HIV, all sorts of other things, but it can't be not noted that this was during the COVID pandemic during its heart and someone spits his bodily fluid in a seemingly appreciable mass with absolutely no justification in the face of a bus driver serving his community and probably not pulling down $300,000 a year."

¶ 37     Next, the trial court made the following statement concerning the respective conduct of Johnson and defendant during this incident:

"Now, some mention has been made by virtue of the fact that Mr. Johnson, I guess, should have stayed in his seat and complied with CTA proper regulations, but I don't begrudge him for getting out of his seat at all. He had every right under the law to do just that. And, in particular, he had the right to seek to forestall the person or stop the person who had done this to him and direct the attention of the police officers seemingly near him by virtue of the presence of a police car in the video. So the fact that he got out of the bus, Mr. Johnson did, for this purpose bothers me not at all.

And it's at this time that [defendant] *** ups and shoots him. He doesn't display the gun and say back off, dude. He doesn't shoot him in the foot. He doesn't shoot in the air. He shoots him at very close range in the face, in the mouth, leaving his teeth splayed out on Madison Street like so many pieces of gravel. *** [T]hat Mr. Johnson didn't die is a gosh darn mystery.

Now, [defendant] was found not guilty of attempt first degree murder. I am not suggesting that he should have been found guilty of attempt first degree murder. That was for the jury. But the fact that somebody gets shot in the mouth is serious business and is indicative of someone whose conduct and whose criminal attitude are beyond the pall and require the protection of this community so that they don't think they can get away with this. And whether they think they can get away with it or not, by virtue of a not insubstantial sentence in the Illinois Department of Corrections, they won't get away with it, at least not for an appreciable period of time.

***

The court also appreciates the horrible visitation [*sic*] without a scintilla of justification visited upon Mr. Johnson, who, together with all of the other persons who serve this

- 12 -

community in the same manner, require the protection of our laws and of our court system."

¶ 38    The court then imposed a sentence of 3 years in the Illinois Department of Corrections (IDOC) on the conviction for aggravated battery to a transit employee. On the conviction for aggravated battery with a firearm, it imposed a sentence of 27 years in the IDOC plus 3 years mandatory supervised release. The sentences are consecutive.

¶ 39    Defendant filed a motion to reconsider sentence, which was denied. This appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41                          A. Sufficiency of the Evidence

¶ 42    Defendant's first argument on appeal is that his conviction for aggravated battery with a firearm should be reversed because the evidence was insufficient to disprove his claim of self-defense beyond a reasonable doubt. He asserts that he had a fundamental right to defend himself after he was unexpectedly punched in the back of the head with a fist and put into a chokehold by an unknown attacker who then squeezed his neck until he started losing consciousness.

¶ 43    Self-defense is an affirmative defense, and once it is raised, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense. *People v. Gray*, 2017 IL 120958, ¶ 50 (citing *People v. Lee*, 213 Ill. 2d 218, 224 (2004)). A defendant is only justified in the use of force that is intended or likely to cause great bodily harm if he "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another." 720 ILCS 5/7-1(a) (West 2020). Self-defense includes the following elements: (1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened

were objectively reasonable. *Gray*, 2017 IL 120958, ¶ 50. If the State negates any one of these elements, the defendant's claim of self-defense necessarily fails. *Id.*

¶ 44    In deciding a claim of self-defense, it is the function of the jury to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *Id.* ¶ 51. It is also incumbent on the jury to resolve conflicts or inconsistencies in the evidence. *Id.* A jury is not required to accept a defendant's evidence of self-defense and may evaluate that evidence in light of its probability or improbability, the circumstances surrounding the event, and the testimony of all the witnesses. *People v. Spiller*, 2016 IL App (1st) 133389, ¶ 27. The applicable standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense. *Gray*, 2017 IL 120958, ¶ 51.

¶ 45    Applying this standard of review and considering the evidence in the light most favorable to the State, we hold that a rational trier of fact could find beyond a reasonable doubt that defendant was not acting in self-defense when he shot Johnson. We find that the testimony of Johnson and the eyewitnesses along with the bus surveillance video evidence provided a sufficient basis for the jury to reject defendant's assertion that he actually believed he was in such imminent risk of danger that necessitated the use of force applied, or to conclude that any such subjective belief by him was objectively unreasonable.

¶ 46    We recognize that certain facts about this incident are largely undisputed. The surveillance video shows defendant spitting at Johnson, turning and walking off the bus, and then looking back in Johnson's general direction for several seconds as he begins walking east on Washington Street. Defendant then turns his head forward and, within another two or three seconds, Johnson catches up to him and punches him in the back of the head. Johnson acknowledged this in both his direct

and cross-examination. The surveillance video then shows Johnson holding defendant's body in some fashion and attempting to maneuver him into Washington Street in the direction of a clearly visible police cruiser. Johnson stated on direct examination that he had defendant in a "headlock." On cross-examination, he agreed he wrapped his arm around defendant's neck, squeezed against his neck, and that he had defendant in a "chokehold."

¶ 47 Beyond this, however, it is entirely defendant's own testimony (1) that he never realized at any point that Johnson was the person who hit him or had an arm around his neck, and instead he believed it was an unknown attacker, (2) that he did not hear Johnson yelling for the police, (3) that he did not realize he was being pulled in the direction of a police cruiser across the street, (4) that the force from the arm around his neck was so great that he could not breathe, was losing consciousness, and feared he was going to die, and (5) that the gun fired accidentally while he was attempting to use it to hit the unknown attacker in the head.

¶ 48 It was the role of the jury to evaluate defendant's credibility as to each of these points, the weight to be given this evidence, and the inferences to be drawn from all the evidence in the case. The jury was not required to accept defendant's testimony on these points, and it could have rejected as improbable and self-serving his testimony that he believed he was in fear for his life and needed to use his gun in self-defense. The jury heard contradictory testimony from Johnson that he was yelling to get the police's attention while he was trying to pull defendant toward the police cruiser and that defendant was facing him by the time of the shooting. McGee described the struggle between the two men prior to the gunshot as "like they had their arms on their shoulders holding each other going into a circular form tussling." Maldonado described the two men as being "in a clinch." The bus surveillance video clearly shows Johnson attempting to pull defendant in the direction of a police cruiser. However, the parties move away from the camera during the

incident so as to make it impossible to say that Johnson applied the level of force around his neck that defendant claims he did. The video also provided the jury with evidence from which to assess whether defendant's demeanor in walking away after the gunshot was consistent with his assertion that he had just escaped an unexpected act of life-threatening strangulation by an unknown attacker in which he had unintentionally discharged a weapon.

¶ 49    In sum, the evidence was sufficient for the jury to find that defendant did not actually believe that he was in any imminent danger that justified use of force. The jury rationally could have concluded that defendant knew or should have recognized that Johnson was attempting to get the police involved in the incident where defendant had spit in Johnson's face moments earlier, and thus any subjective belief by defendant that force was necessary in this circumstance was not objectively reasonable.

¶ 50    Defendant cites two cases in support of the proposition that a person being strangled by an assailant has the legal right to use even deadly force in self-defense. See *People v. Harling*, 29 Ill. App. 3d 1053 (1975); *People v. Liddell*, 32 Ill. App. 3d 828 (1975). Both of these cases involved the reversal of bench trial convictions for voluntary manslaughter. Both cases involved similar facts wherein the defendant claimed his respective victim was strangling him and that he had acted in self-defense in fatally stabbing the victim with a knife. In both cases, the defendant was the sole eyewitness to the stabbing. Both courts found that the defendant's testimony that he acted in self-defense was neither improbable nor contradicted in material part, and both courts expressed having grave doubts as to the defendant's criminal culpability. *Harling*, 29 Ill. App. 3d at 1059-60; *Liddell*, 32 Ill. App. 3d at 831-32.

¶ 51    We find neither of these cases to be of aid to defendant's argument in this case. Unlike in those cases, the jury here had before it evidence other than defendant's own testimony from which

to determine whether the shooting of Johnson was justified. And for the reasons discussed above, this was an appropriate case for the jury to find defendant's testimony that he acted in self-defense to be improbable and self-serving. We therefore hold that the evidence sufficiently supported the jury's rejection of defendant's claim of self-defense beyond a reasonable doubt.

¶ 52                          B. Evidence of CTA Procedures

¶ 53       Defendant's second argument on appeal is that the trial court violated his constitutional right to present a complete defense when it excluded evidence that Johnson's actions violated CTA policy. He attaches within the appendix of his opening brief two CTA standard operating procedures. One is titled "Communication During and Following a Criminal Incident," and it states on its face that it is appliable to bus drivers. It contains an instruction that during a criminal incident, "Do not threaten or argue with the offender." The second is titled "Criminal Incidents on CTA Property," and indicates that it is applicable to all operations personnel. Defendant asserts that this second document similarly contains this direction not to threaten or argue with an offender, although the court does not find such language within it. Defendant contends that the trial court's exclusion of these two documents prevented him, in the defense of this case, from providing the jury with probative information that Johnson's actions toward him violated CTA policy and were largely motived by a personal desire for revenge. Defendant also argues that this ruling deprived him of the opportunity to show that Johnson was a violent individual, which would have bolstered his claim of self-defense. He characterizes the exclusion of this evidence as akin to the erroneous exclusion of *Lynch* evidence. See *People v. Lynch*, 104 Ill. 2d 194, 200 (1984) (a defendant raising self-defense is entitled to introduce evidence showing victim's aggressive and violent character to support defendant's version of disputed events).

¶ 54       The parties heavily dispute whether this issue was adequately preserved in the trial court. The

State urges us to find forfeiture on the grounds that this issue was never addressed on the record at trial, defense counsel did not object to the State's motion *in limine* to prohibit mention of CTA policies or rules, and the issue was first raised in posttrial motions. The State also asks us to strike from the appendix to defendant's opening brief the two CTA operating procedures documents, which were not used at trial. Although we believe that we would be justified in finding forfeiture or striking these documents, we decline to do so under the facts of this case. See *People v. Conner*, 2025 IL App (4th) 240972, ¶ 18 (forfeiture is a limitation on the parties, not the court, and we may exercise our discretion to review an otherwise forfeited issue). At the hearing on the posttrial motion wherein this error was raised, the trial court stated that it "recall[ed] specifically [at a pretrial conference in chambers] discussing this issue regarding CTA procedures and how the defense wished to bring in the fact that [Johnson] apparently didn't comply in that he got off the bus when he should not have gotten off the bus after he had been spit on." The trial court accepted responsibility for failing to ensure that the argument on this issue was preserved on the record. It also explained that its ruling had been that any CTA policy that Johnson should have remained on the bus was irrelevant to whether and under what circumstances defendant would have been justified in shooting or wielding a gun against him in the manner that he did. Given these statements by the trial court, we conclude that this issue was sufficiently preserved for purposes of appellate review and proceed to address it on the merits.

¶ 55    Defendant argues that we should undertake *de novo* review of whether the trial court "violated [his] constitutional right to present evidence." However, where a defendant's claim is that his constitutional right to present a complete defense was violated due to a trial court's improper evidentiary rulings, the proper standard of review is abuse of discretion. *People v. Williams*, 2020 IL App (1st) 162512, ¶¶ 73-74 (citing *People v. Burgess*, 2015 IL App (1st)

130657, ¶ 133). We will find abuse of discretion only when a trial court ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the court. *People v. Patrick*, 233 Ill. 2d 62, 68 (2009).

¶ 56    In this case, we hold that it was not an abuse of discretion for the trial court to conclude that any internal CTA policy directing bus operators not to engage, argue with, or threaten an offender during a criminal incident was irrelevant to defendant's self-defense claim. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of an action either more or less probable than it would be without the evidence. *People v. Morgan*, 197 Ill. 2d 404, 455-56 (2001). A trial court may reject evidence on grounds of relevancy if the evidence is remote, uncertain, or speculative. *Id.* at 456.

¶ 57    The fact of consequence that defendant argues is made more probable by this evidence is that defendant was not the aggressor here, and instead Johnson was the aggressor. We agree with the trial court that the existence of this CTA policy does not make it any more likely that Johnson was the aggressor or that defendant was not the aggressor than it would be without this evidence. We find it too remote or speculative to say that Johnson's disregarding of his employer's directive not to argue with or threaten an offender committing a criminal incident makes him more likely to be an aggressive or violent individual. We therefore reject any argument that this was akin to *Lynch* evidence that defendant was entitled to present in support of his claim of self-defense.

¶ 58                                    C. Sentencing

¶ 59    Defendant's remaining arguments are that his sentences for both aggravated battery with a firearm and aggravated battery to a transit employee are the result of sentencing errors by the trial court. As to the former, he argues that his 27-year sentence is constitutionally disproportionate to the offense and resulted from the trial court's ignoring of critical mitigating evidence that he acted

in self-defense. As to the latter, he argues that his 3-year sentence resulted from the trial court's improper use of a factor implicit in the offense as an aggravating factor along with the use of its personal opinion as an aggravating factor.

¶ 60 A trial court has broad discretionary powers in choosing the appropriate sentence for a defendant because of its superior position to assess the credibility of witnesses and to weigh evidence presented at the sentencing hearing. *People v. Jones*, 168 Ill. 2d 367, 373 (1995). Where, as here, the sentence imposed by the trial court is within the statutory range permissible for the criminal offenses of which the defendant has been tried and convicted, the appellate court has the power to disturb that sentence only if the trial court abused its discretion. *Id.* at 373-74. Abuse of discretion exists where the trial court imposes a sentence that is greatly at variance with the spirit and purpose of the law or manifestly disproportionate the nature of the offense. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We will not substitute our judgment for that of the trial court merely because we would have weighed relevant sentencing factors differently. *Id.* at 213.

¶ 61 *1. Aggravated Battery with a Firearm*

¶ 62 As indicated above, defendant argues that his 27-year sentence for aggravated battery with a firearm was constitutionally disproportionate to the offense and resulted from the trial court's ignoring of critical mitigating evidence, *i.e.*, the "overwhelming" evidence that he acted in self-defense in the shooting of Johnson. See 730 ILCS 5/5-5-3.1(a)(4) (West 2020) (trial court shall accord weight in mitigation to the fact that "[t]here were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense").

¶ 63 The Illinois Constitution requires that criminal penalties be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11. Balancing these retributive and rehabilitative purposes requires

consideration of " 'all factors in aggravation and mitigation, including, *inter alia,* the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it.' " *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 87 (quoting *People v. Center*, 198 Ill. App. 3d 1025, 1033 (1990)). We presume that a trial court has evaluated the relevant factors in mitigation before it, and that presumption cannot be overcome without affirmative evidence of the trial court's failure to do so. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 22. There is no requirement that a trial court must set forth every reason or specify the weight it gave to each factor when determining the sentence. *Id.* ¶ 24.

¶ 64 As with defendant's sufficiency-of-evidence argument above, his argument that the trial court ignored critical mitigating evidence that he acted in self-defense requires the acceptance of defendant's own testimony that he was choked nearly to unconsciousness and was in fear for his life at the time Johnson was shot. Just as we found above that the jury properly could have rejected this testimony as improbable, self-serving, and contradicted by other evidence, so could the trial court have rejected it when sentencing defendant. The trial court was clearly aware of defendant's position that he acted in self-defense. Thus, when the trial court stated that there was not "a scintilla of justification" for defendant's shooting Johnson, we interpret this as the trial court's rejecting the credibility of this testimony as opposed to refusing to consider mitigating evidence. The trial court is in a far superior position to make these sorts of sentencing determinations that involve issues of credibility and the weight to be given evidence. *Jones*, 168 Ill. 2d at 373.

¶ 65 Defendant's sentence is within the applicable sentencing range for aggravated battery with a firearm of between 6 and 30 years. See 720 ILCS 5/12-3.05(e)(1), (h) (West 2020); 730 ILCS 5/5-4.5-25(a) (West 2020). Defendant had a criminal history of four prior felony convictions and two

juvenile adjudications for aggravated battery. Also, multiple weapon-possession charges stemming from this incident were *nolle prossed* but eligible for consideration in sentencing. The shooting caused Johnson to undergo five surgeries on his jaw, endure five or six months of it being wired shut, and the permanent loss of about 20% of its function. And the trial court believed that protection of the public from someone who at age 38 would shoot another person in the face on a public street was an appropriate consideration. We conclude that the 27-year sentence imposed in this instance was not an abuse of discretion.

¶ 66                    *2. Aggravated Battery to a Transit Employee*

¶ 67         Defendant also contends that his 3-year sentence for aggravated battery to a transit employee is the product of an impermissible "double enhancement" because, he asserts, the trial court improperly considered Johnson's status as a transit employee as an aggravating factor when it was also a factor inherent in the offense. He argues that this is shown by the trial court's comments extolling the importance within the community of Johnson's work as an employee of the CTA and of transit system employees more broadly. See *supra* ¶¶ 35-36.

¶ 68         There exists a general prohibition against the use of a single factor both as an element of a defendant's crime and as an aggravating factor justifying the imposition of a harsher sentence than might otherwise have been imposed. *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992). Such use of a single factor is sometimes referred to as a "double enhancement." *Id.* at 84. This rule rests upon the assumption that the legislature has already considered the elements of the crime in designating the appropriate sentencing range. *People v. Phelps*, 211 Ill. 2d 1, 12 (2004). The rule does not require a trial court to unrealistically avoid mentioning a factor inherent in the crime during sentencing or to treat it as if it did not exist. *People v. O'Toole*, 226 Ill. App. 3d 974, 992 (1992). Even if a trial court mentions an improper fact in sentencing, a defendant must show that

the trial court relied upon that particular fact when imposing the sentence. *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 47.

¶ 69     We find no basis in this case for concluding that the trial court treated Johnson's status as a transit employee as an aggravating factor when sentencing defendant on the conviction for aggravated battery to a transit employee. The trial court did not state that it was doing this. And when we review its comments in context, we believe that most of them either pertain generally to the facts of the case or were directed at the more serious shooting incident that gave rise to the conviction for aggravated battery with a firearm. For example, its characterization of this as "an abominable circumstance," followed by most of the statements about which defendant complains, led immediately into comments about "the selfish manner in which some people wish to express themselves with firearms" and use "guns to exact their measure of justice when they feel themselves slighted." We note that the rule against double enhancement would not prohibit the consideration of Johnson's status as a transit employee on the separate conviction for aggravated battery with a firearm. See *Phelps*, 211 Ill. 2d at 17. The only comment pertaining to the spitting incident that gave rise to the aggravated battery to a transit employee conviction which touched upon Johnson's job was its statement that Johnson was a "bus driver serving his community and probably not pulling down $300,000 a year." We view this as an acceptable comment by the trial court concerning the facts and nature of the offense, and not an improper use of Johnson's employment for purposes of a double enhancement.

¶ 70     Defendant argues for similar reasons that his sentence for aggravated battery to a transit employee was the result of the trial court's inappropriate consideration of the victim's personal traits or status within the community (*People v. Joe*, 207 Ill. App. 3d 1079, 1087 (1991)) or of the judge's own personal opinions about the offense (*People v. Henry*, 254 Ill. App. 3d 899, 905

(1993)). We have reviewed the trial court's comments in their entirety, and we find no basis to conclude that defendant's 3-year sentence for aggravated battery to a transit employee resulted from its consideration of such inappropriate factors in aggravation. This is a class 3 felony for which the sentencing range was between 2 and 5 years. See 720 ILCS 5/12-3.05(d)(7), (h) (West 2020); 730 ILCS 5/5-4.5-40(a) (West 2020). Defendant's sentence was only one year more than the statutory minimum, and nothing about it indicates to us that the trial court considered any of the improper factors about which defendant complains.

¶ 71                                    *C. Bias*

¶ 72       Finally, defendant argues that certain comments by the trial court show sufficient judicial bias to overcome the presumption that he received a fair sentencing hearing. These include, in addition to the trial court's comments in the preceding section, its further comments about Johnson having the right to "forestall" the person who had spit on him and get the attention of police, along with its statement that it "bothers me not at all" that Johnson got out of the bus for this purpose. See *supra* ¶ 37. Defendant contends that these comments amount to the trial court going "out of its way to gratuitously approve Johnson's unjustified attack" on him. He requests a new sentencing hearing before a different trial judge.

¶ 73       Trial judges are presumed to be impartial, and the party challenging a judge's impartiality bears the burden of overcoming this presumption. *People v. Romero*, 2018 IL App (1st) 143132, ¶ 96. Something more than an unfavorable result to the defendant is required to demonstrate bias or prejudice on the part of the trial court, meaning there must be a showing of animosity, hostility, ill will, or distrust towards the defendant. *People v. Montgomery*, 2023 IL App (3d) 200389, ¶ 28. Our review of whether a trial judge demonstrated bias in sentencing is *de novo*. *Id.*

¶ 74       In our view, the trial court's statements about which defendant complaints amount to fair

comments about the evidence and arguments of the case. This portion of the trial court's comments appears to be in reference to the argument that defendant had raised in his posttrial motion that the court erred by refusing to admit evidence that Johnson's conduct violated the CTA's internal policies. We have further held above that it was the purview of the trial court to reject defendant's claim of self-defense for purposes of sentencing, and thus we do not interpret its comments as approving of an unjustified attack by Johnson on defendant. We find no showing of bias or prejudice that would warrant resentencing in this case.

¶ 75                                    III. CONCLUSION

¶ 76        For the reasons set forth above, defendant's conviction and sentence are affirmed.

¶ 77        Affirmed.